# CHARLESTON

## SPIES v. BUTTS et al.

Submitted February 8, 1906.    Decided April 10, 1906.

```
,59    385
'65     45
```

1. APPOINTMENT OF RECEIVER.

    The application for the appointment of a receiver is addressed to the sound discretion of the court. The appointment is not a matter of right. The power is a discretionary one to be exercised with great circumspection. The discretion is not arbitrary or absolute, but sound and judicial; not to be too strictly limited, or lightly used. (p. 397.)

2. RECEIVER—APPOINTMENT OF.

    Where, under an executory contract of sale of many tracts of land and standing timber a cash payment is made and the purchaser agrees to give notes for the deferred monthly payments and takes possession of the subject of his purchase and proceeds to cut and manufacture into lumber and remove therefrom the timber and market the same as provided in the contract, but refuses to make any further payments on the purchase money or to make the notes therefor as required by the contract because of defect of grantor's title tendered to the purchaser; the timber being the chief value of the land and unless operated the title to much of the timber would fail because of the limited time in which it could be removed under the contracts by which it was held by the vendor. Held: Sufficient ground for the appointment of a receiver on the application of the vendor. (p. 398.)

3. EQUITY—Executory Contract—Payment of Purchase Money—Retention of Timber.

    Where the purchaser under such contract has continued in possession cutting, manufacturing into lumber and removing the timber, refusing to pay anything on account of the purchase-money, and refusing to make the notes for the monthly payments of the purchase-money as required by the contract; equity will give the vendor a right to hold the manufactured product remaining on the premises liable to the purchase money past due him. (p. 407.)

4. TAXES—Purchaser in Possession to Pay Taxes.

    A purchaser in possession of land under an executory contract of sale is liable as between himself and the vendor for all taxes assessed on the land after the commencement of his possession, in the absence of a stipulation to the contrary. (p. 403.)

Appeal from Circuit Court, Upshur County.

Bill by Henry Spies against Ida M. Butts and others. Decree for plaintiff and Ida M. Butts and others appeal.

*Affirmed.*

W. G. BENNETT, C. WOOD DAILEY, E. H. MORTON and
G. M. FLEMING, for appellees.

W. W. BRANNON, DAVIS & DAVIS, and V. B. ARCHER, for
appellants.

MCWHORTER, PRESIDENT:

On the 28th day of January, 1904, Henry Spies of the
county of Randolph entered into a contract with Ida M.
Butts, James McCormick and Harry T. Wilson to sell to the
said parties of the second part all the real estate and personal
property owned by him in the counties of Randolph, Upshur
and Webster as follows:

"(a) All of the several tracts of land, coal and standing
timber lying and being in the said counties of Randolph, Up-
shur and Webster in the said State on the waters of the Lit-
tle Kanawha, Buckhannon and Holly Rivers and their tribu-
taries which are shown upon the schedule and blue print map
hereto attached and made a part of this contract, together
with all other tracts of land, town lots, coal or standing tim-
ber owned by the said party of the first part in the several
counties aforesaid or any of them, whether shown upon said
schedule and map or not, the whole aggregating 10,699.25
acres of land, 16,059.02 acres of standing timber, and 14,-
867.34 acres of coal.

"(b) All of the personal property owned by the party of
the first part in the counties aforesaid or either of them, con-
sisting of manufactured lumber, fallen timber or logs, tools,
machinery, store goods, and other personalty, whether of the
character so designated or not, save and except the follow-
ing: 4,000 feet of figured maple lumber; 2,800 feet of bird's
eye poplar; 1,500 feet of quartered oak; two second-hand
boilers; one riding horse; one cow; one typewriter; books,
book-accounts, monies, stocks, securities and choses in ac-
tion and household goods.

"(c) All of the capital stock of the Pickens and Hackers
Valley Railroad Company.

"It being the intent and purpose of this contract to sell
unto the parties of the second part all of the estate of the
party of the first part both real, personal and mixed in the
counties aforesaid or either or any of them, save and except
only those items of personal property hereinbefore excepted
and reserved. It is further understood that the acreage of

said realty is estimated by surface and not horizontal measurement, and that the acreage of land, coal and timber are not exclusive each of the other, but that the same tract may and in many instances does constitute a part of the aggregate total given under one or more of such descriptions."

The parties of the second part agreed to pay the sum of $400.000 as follows: $62,500 in cash upon the signing of the agreement and $37,500 in six months thereafter for which the parties made their notes of the date of said agreement, which notes were to be further secured by the deposit with the said Spies as collateral security the one-tenth of the total capital stock to be issued by the parties of the second part upon the formation of a corporation to which they proposed to convey the property and which corporation was to be immediately organized by them; the residue of the purchase price, $300,-000, was "to be secured or evidenced by the notes of said proposed corporation to be endorsed by the parties of the second part and to be due and payable," the sum of $2,500 on or before the 1st day of May, 1904, the second a like sum on the 1st day of June, 1904, "and the residue to be divided into 59 notes for the sum of $5,000 each and due and payable on or before the first day of each month thereafter, all to bear interest at the rate of five *per centum* per annum from and after the 1st of November, 1904;" and as further security it was provided that in his deed to be thereafter made for the property, Spies should retain his vendor's lien on all the said real estate, and a deed of trust was to be executed by the said Pickens and Hackers Valley Railroad Company upon all its real estate, rights of way, rolling stock, equipment, rights and franchises to secure the payment of the same, the execution of which deed of trust was to be contemporaneous with the transfer to the parties of the second part of the capital stock of the said corporation; the party of the first part agreed to make, execute and deliver to the parties of the second part, or to such person, persons or corporation as they might designate, as soon as might be after the execution of the contract and not later than the 1st day of July, 1904, a good and sufficient deed for all said real estate with covenant of general warranty and free from all encumbrances, together with such bill or bills of sale for the personal property as the parties of the second part might request or desire; the

parties of the second part were to have full and complete possession of all said personalty and title thereto immediately upon the payment of the said sum of $62,500 and the execution of the notes for the $37,500 together with the right to enter in and upon the real estate and to cut and remove the timber therefrom, or the coal thereunder, and to operate, use and control the said railroad and to receive and collect the revenues arising therefrom; and in the event of the said Spies not being able to deliver to the parties of the second part the total acreage of land, coal or standing timber described, in that event there should be abated from the purchase price therein agreed upon the sum of $3.00 per acre for each acre of surface so conveyed, $7.00 per acre for each acre of coal, and $19.00 per acre for each acre of standing timber or an aggregate sum of $29.00 per acre for each acre of land containing both coal, standing timber and surface; or, if the title should fail as to any portion so conveyed, a like abatement and no more should be made upon such failure. It was further understood and agreed that if said Spies should be unable by the 1st day of July, 1904, or at the time of the delivery of the deed mentioned, to make good title to any of the tracts of the land, coal and standing timber intending to be conveyed by said agreement, the same might be conveyed by him to the parties of the second part at any time before the final settlement should be made of the purchase price therein agreed upon upon the perfecting of his title thereto and no abatement should be made of said purchase price by reason of any such tracts so conveyed before final settlement. The said Spies further covenanted that there were no liens or encumbrances upon any of the personal property and that the description of the same should be taken and held to include the locomotive engine then lately ordered on behalf of said railroad company and not yet then delivered to it.

On the 4th day of August, 1905, Henry Spies filed his bill of complaint in the circuit court of Upshur county against Ida M. Butts, James McCormick, Harry T. Wilson, as individuals in their own right and as partners trading under the firm name of the Butts, McCormick and Wilson Company, The Pickens and Hackers Valley Railroad Company, a corporation, The Butts, McCormick and Wilson Company, a corporation, the Ohio River Lumber Company, a corporation,

and the Oak Lumber Company, a corporation, alleging that for many years prior to the date of said agreement plaintiff was extensively engaged in the lumber business in the counties of Randolph, Webster and Upshur and that while so engaged he became the owner of a large amount of property both real and personal; the real consisting mainly of coal, timber and timber lands in said counties; that the personal property consisted largely of manufactured lumber, fallen timber or logs, tools, machinery and store goods; that for the purpose of successfully carrying on his said business it had become necessary for him to construct the said railroad and for the more efficient management thereof he formed the corporation called the Pickens and Hackers Valley Railroad Company in which he owned all the capital stock except thirteen shares of which plaintiff's wife owned ten shares and G. M. Fleming, A. I. Boreman and E. F. Kummer owned each one share ; that shortly before the 28th day of January, 1904, the said Butts, McCormick and Wilson entered into negotiations with him for the purchase of his entire holdings with the exceptions specified in the agreement, which negotiations were consummated on the 28th day of January, 1904, when the said agreement was entered into; that the consideration of said agreement was the sum of $400,000 made up as follows :

"Personal property of the value of forty-one thousand eight hundred and ninety-six dollars ($41,896.00); the Pickens and Hackers Valley Railroad of the value of sixty thousand dollars ($60,000.00); the equipment of said road of the value of fourteen thousand and three hundred and eighty-seven dollars ($14,387.00); land exclusive of coal and timber, of the value of thirty-two thousand and ninety-seven dollars ($32,-097.00); coal land of the value of one hundred and four thousand and seventy-six dollars ($104,076.00); *timber on lands, of the value of one hundred and forty-five thousand seven hundred and ninety-four dollars* ($145,794.00); the residence and lot and store house of the plaintiff in the town of Pickens, of the value of seventeen hundred and fifty dollars ($1750.00); amounting in the aggregate to the said sum of four hundred thousand dollars ($400,000.00).

The bill alleging that the provision in the contract in regard to abatement for failure to deliver the total acreage was inserted in said contract by reason of a mutual mistake

of calculation; that it was not intended that the abatement for standing timber should be $19.00 per acre but only $9.02, the latter being the price per acre for timber; that the defendants took possession immediately of all the property except the house in Pickens which the plaintiff was willing to deliver whenever the defendants complied with the contract; that the defendants had paid the sum of $62,500 and had paid the note for $37,500 and had also paid a note of $2,500 due May 1, 1904, and $900 on the note for $2,508 due June 1, 1904, but that except the sums named the entire purchase money remained unpaid although the sum of $71,600 with interest from November, 1904, was past due; that the defendants had failed and refused to execute the 59 notes for $5,000 each; and had failed in good faith to form the corporation provided for by the contract; that within the last few days he had learned that the defendants by deed dated June 20, 1905, had conveyed all the personal and real estate to a corporation stated in the deed to have been organized under the laws of the State of South Dakota but denied that the said corporation had complied with the laws of West Virginia which would enable it to carry on business, and alleged that such action was taken as a mere pretense of compliance with the provisions of the contract and for the purpose of hindering, delaying and defrauding the plaintiff in the protection of his rights; alleging that the defendants were manufacturing and selling the lumber from the said property and using the money collected in carrying on other enterprises instead of paying the plaintiff; that the defendants were so conducting their operations as to work irreparable damages and loss to the plaintiff, that the defendants knew when they entered into the contract that a very considerable part of the timber sold had a time limit within which it was to be removed and that instead of removing the time limit timber they were removing timber on land which he owned and on which there was no time limit, and by so doing would permit the time to expire with the idea of purchasing the same after the limit had expired at a much less price, that they had manufactured lumber of the market value of $120,000; that the defendants were using the portable mills and tools sold them in the manufacture of lumber on tracts adjacent to the land purchased

of the plaintiff and alleging that the mills and tools should
be used in the manufacture of lumber on the tracts of lands
purchased of him, and the money should be used in the pay-
ment of the purchase money due him; that the defendants were
concerned in other corporations engaged in the manufacture
of lumber on adjacent tracts of land and that said corpora-
tions were formed for the purpose of hindering, delaying
and defrauding plaintiff in the assertion of his rights; alleg-
ing that the defendants were inexperienced in the lumber
business and that the business was being carried on at a
loss; that the defendants had not caused the railroad com-
pany to execute a deed of trust on its property and that
he was ready to transfer all the stock in the said company
to the defendants; that the plaintiff had executed and ten-
dered to the defendants a good and sufficient deed for all
the real estate sold by him to them, and that the defendants
had refused to accept the same; that when the said deed
was presented to them they assigned a number of reasons
for not accepting the same, that the deed did not comply
with the requirements of the contract; alleging that it was
true that of the real estate amounting to 2943.81 acres the
plaintiff only owned an undivided half but that the defend-
ants knew this when they entered into the contract and that in
estimating the acreage only one-half of this tract was taken;
that it was true that in some cases he owned only certain
marked trees, and that in one tract of 670 acres he only
owned one-half of the coal but that this was known to the
defendants before making the contract; and alleged that
such objections were not made in good faith but only for
the purpose of hindering and delaying the day of accounting
that the defendants might further despoil the property of
the plaintiff; that since the tender of the said deed and the
refusal by the defendants to accept it the defendants had con-
tinued to cut and manufacture and remove the timber, by
reason of which the defendants were estopped from denying
their obligation to accept the said deed; that since the for-
mation of the South Dakota corporation he was unable to say
whether the operations had been carried on by the defend-
ants as the firm or as the corporation, but that there
had been no apparent change in the management of the bus-
ines and that the plaintiff did not believe that there had in

fact been a change in ownership but that the whole pro-
ceeding had been taken for the purpose of hindering, de-
laying and defrauding the plaintiff, that no one had set
up any adverse title of claim to any of the property em-
braced in his sale, but that it was true that as to one or
two small tracts he had only the equitable title but that he
could and would obtain the legal title to such tracts, and that
even should the plaintiff fail to get good title to such tracts
such failure should not interfere with the closing of the
contract and would only entitle the defendants to refuse
to take so much of the property as the plaintiff could not
make good title for; that in making out the bill of sale of
the personal property there had been omitted therefrom
credits to the amount of $1,075, mentioning the items thereof;
alleging a purpose on the part of the defendants to exhaust'
the personal property conveyed to them, to sell and con-
vert to their own use the standing timber conveyed to them
without paying to the plaintiff anything further than they
had already done, and that if permitted to longer mis-
manage the business the plaintiff would be deprived of a
large part of the security for his debt and would not be
able to enforce his lien on said property; that the defend-
ants had refused to pay taxes for the year 1904 on the real
estate conveyed to them by plaintiff and that unless re-
deemed the same would be sold by the state; that in order
to prevent such sale he had been compelled to pay a part
of the taxes thereon and that the defendants refused to re-
fund to him the amount so paid; that the land sold was
rough and not suited for agricultural purposes and that the
timber thereon constituted the chief value, that the coal
lands had depreciated in value and that when the land was
denuded of its timber it would be wholly insufficient to sat-
isfy the purchase money lien of the plaintiff; alleging that
the defendants were insolvent. and praying that the said
contract of January 28th, 1904, be corrected so as to ex-
press the true meaning and intent of the parties; that
the plaintiff have a decree for the amount due him; that
his lien be enforced; that a receiver of the said property be
appointed; that said receiver be authorized to carry on the
business of manufacturing into lumber the standing timber
and the timber then down; and that an injunction be granted

enjoining and restraining the said defendants both individually and as a firm from cutting the timber or removing any part of it that had already been cut, or to sell any that had been manufactured, and that they be enjoined from interfering in any way with the receiver in the operation of the business.

The plaintiff gave notice of motion for the appointment of a receiver and the defendants gave notice of their motion to dissolve the injunction. The defendants Butts, McCormick and Wilson and Butts, McCormick and Wilson Company filed their joint and several answer on the 26th day of August, to which plaintiff replied generally. The answer averring that the contract as set out in the plaintiff's bill was correct; that there was no separate valuation of the different items, but that it was a sale in gross for the consideration of $400,000; denying the allegation in regard to the abatement of $9.02 for standing timber, but that it was intended to be abated $19.00, as set out in the contract, and denying that the fixing of $19.00 as the abatement was a mutual mistake; that the plaintiff had refused to deliver to them possession of the house at Pickens and that after the execution of the contract plaintiff fraudulently sold and disposed of certain lumber covered by the contract falsely pretending to have sold the same prior to the execution of the said contract; that the defendants had paid the plaintiff $105,525.07, and had put improvements on the property to the amount of about $70,-000 and denying that they owed the plaintiff $71,600, but that they had paid already more than was due; that they had formed the corporation in South Dakota and had conveyed the said property to the corporation and the formation of the corporation was in pursuance of the terms of the contract and was organized in good faith; that it was true that the defendants had refused to execute the 59 notes of $5,000 each, but that their failure was due to the failure of the plaintiff to tender them a deed in compliance with the contract; denying that they were applying the proceeds of the property sold to them by the plaintiff to other enterprises with the intention of defrauding the claim of the plaintiff; denied that it was required of them to remove the timber off the time limit tract rather than off the other tracts, but that they could cut timber where most con-

venient, and that on account of the location it would be impossible to cut and manufacture all the timber within the time on which there was a time limit; that the plaintiff never requested them to cut the timber from the time limit tracts rather than that on which there was no time limit; denying that they were inexperienced in the lumber business and claiming that their net profits since commencing business amounted to $82,000; that they had never executed a deed of trust to Spies for the railroad because Spies was the holder of all the corporate stock of the railroad; that plaintiff had tendered the deed to them, but that they had refused to accept it and filed with the plaintiff a list of objections to the same and assigned a number of reasons for not accepting the deed; that they knew at the time of the contract that plaintiff only owned a half undivided interest in a tract of 2943.81 acres, but did not know of other deficiencies of title and encumbrances and that they relied solely on the contract of plaintiff to convey to them with general warranty; denying the insolvency of the defendants, but on the contrary that the assets exceeded the liabilities by the sum of $157,316.66; and denied that the security of the plaintiff for his purchase money was being removed, but averred that instead they had increased the value of the real estate $39,660.85; denied that any purchase money was due plaintiff, but that after deducting abatements and credits for improvements the defendants would be credited with additional purchase money, alleging that they had always been willing to comply in all things with the terms of the contract, and praying for the specific performance of the contract, and asked that a commissioner be appointed to ascertain and report the total number of acres of land, coal and timber, which the plaintiff is able to convey in accordance with the said contract and the condition of the title of plaintiff to the several tracts.

On the 9th day of September, 1905, the cause came on to be heard upon the bill and exhibits, the answer and exhibits and replication to the answer, upon the motions to appoint a receiver and to dissolve the injunction, upon the several affidavits filed in support of the plaintiff's motion for receiver and in opposition to the motion to dissolve the injunction and the affidavits filed by defendants in support of their motion to dissolve the injunction and in opposition to the motion to

appoint a receiver. When the court was of opinion that the case was one proper for the appointment of a receiver, and proceeded to appoint Clarence D. Howard receiver of all and singular the real estate in the bill and exhibits mentioned and the assets both real and personal of the said railroad; the stock of manufactured lumber on the premises in controversy, or so much thereof as had been manufactured by defendants from the timber cut on the lands purported to be sold by plaintiff to defendants or from the standing timber sold by him to them, together with any such timber severed from the land and not manufactured into lumber; and it was decreed that upon giving bond as required in the penalty of $50,000 said receiver should forthwith take into custody the said property to sell and dispose of the said stock of manufactured lumber retaining the proceeds thereof until the further order of the court, to operate and conduct the business of the railroad in question and all tram roads constructed by the parties hereto upon the lands in controversy; to employ such agents, clerks and servants as he might deem necessary therefor, and to go forthwith upon the premises and investigate and report to the court all matters touching the propriety or necessity of cutting any or all of the standing timber in controversy, the probable cost thereof, and the advisability of such operation under the order of the court.

"It is further ordered that the receiver shall from time to time report what he shall do hereunder and not less often than twice during each year of his said receivership.

"And the Court is further of opinion and doth overrule the motion of the defendants for the dissolution of the injunction hereinbefore awarded, in so far as the same enjoins the defendants from selling or otherwise encumbering the real estate described in the bill herein, or from removing, selling or shipping any lumber manufactured from any of the timber sold by the plaintiff to the defendants, but doth dissolve said injunction so far as the same restrains the defendants from selling or encumbering any part of the personal property in the bill mentioned and covered by the contract of sale between the plaintiff and defendants; but it is ordered that the plaintiff do enter into further bond within 10 days from this date in the penalty of $2000.00-100, conditioned upon the payment of all costs and damages as may be encurred by

any party hereto in the event the said injunction shall be hereafter dissolved.

"And the defendants now desiring to set aside so much of this order as appoints said receiver, and refuses to dissolve said injunction by the giving of an appropriate bond as hereinafter provided, it is ordered that upon the defendants or some one for them entering into bond with approved security, either individual or corporate, before the clerk of this Court, within 14 days from this date in the penalty of $150,000.00, conditioned upon the payment to the plaintiff of such moneys as may be found due to him upon future decree in this cause, said receivership be thereby vacated and that the injunction herein do stand dissolved. And it is further ordered that the said receiver heretofore appointed do not take possession of any of the said property within the said period of 14 days limited for the giving of such bond."

From which decree the defendants Ida M. Butts, James McCormick, Harry T. Wilson and Butts, McCormick and Wilson Company appealed and claim that the court below erred in appointing a receiver; that the court erred in holding that the plaintiff had a lien upon the manufactured lumber on the premises and in appointing a receiver therefor; and in directing the receiver to sell the same; that the court erred in overruling the motion to dissolve said injunction; and erred in fixing the amount of the bond to be given by the defendants at $150,000, the same being unreasonable and excessive in amount.

Did the court err in appointing a special receiver in case at bar in view of all the circumstances of the case? Sec. 28 ch. 133, Code, makes provision for such appointment by a court of equity in any proper case pending therein in which the property of a corporation, firm or person is involved and there is danger of the loss or misappropriation of the same, or a material part thereof. Sec. 6823, 5 Thomp. Corp., says: "Unless there is a statute giving the right to a receiver in a given state of facts, no one can demand the appointment of a receiver *ex debito justitiae;* but the question whether or not a receiver will be appointed in a given case is addressed to the sound discretion of the chancellor, under all the circumstances. The discretionary power possessed by courts of equity of appointing receivers or refusing applications for

such appointment will not be interferred with on appeal except in cases where the discretion has been manifestly abused; this being the general rule as to the appellate review of discretionary action." And Alderson on Receivers, page 75: "The application for the appointment of a receiver is always addressed to the sound discretion of the court. The appointment is not a matter of right. The power to appoint a receiver is a discretionary one to be exercised with great circumspection. The discretion is not arbitrary or absolute, but sound and judicial. It is not to be too strictly limited or lightly used."—Citing many cases in support of the principle. In *Crane* v. *McCoy*, 1 Bond. 422 U. S. Cir. Ct., it is held: "The application for the appointment of a receiver is always addressed to the sound discretion of the court to which it is made. As a general rule such appointment will be made in all cases where the interest of parties seem to require it." In *Cameron* v. *Improvement Company*, 20 Wash. 169, 72 Am. St. Rep. 26, it is held: "The appointment of a receiver *pendente lite* is a matter committed to the sound discretion of the judge before whom the proceeding is pending." And it is there further held: "The appointment of a receiver will not be disturbed on appeal, unless it appears affirmatively to have been unwarranted, and to show this there must be a great preponderance of evidence against the propriety of the appointment, as the appellate court will not undertake to weigh the testimony where there is substantial conflict in it." In a note to said case at page 96 it is said that the appointment of a receiver is proper where it is sought to enforce a vendor's lien and there is danger of loss by the purchaser's insolvency or otherwise, citing *Hughes* v. *Hatchett*, 55 Ala. 631. In *McCaslin* v. *State*, 44 Ind. 151, it is held: "Where a purchaser takes possession of and claims real estate by virtue of his purchase, and is in possession at the commencement of an action for the recovery of the purchase-money and for the appointment of a receiver to take charge and possession of the real estate pending litigation, because of waste committed and threatened by the purchaser, the appointment of a receiver is not such a change of possession as to estop the vendor from enforcing his remedy." See also 4 Pom. Eq. Juris., sec. 1334.

Plaintiff had been many years carrying on a heavy busi-

ness in the lumber trade and had accumulated a large number of tracts of land and of standing timber in the three counties of Randolph, Upshur and Webster, and had in connection with his business built a railroad of some 13 or 14 miles in length from the town of Pickens into his timber lands at a cost, with its equipment, of some $74,000 for the purpose of carrying his manufactured product to market. The defendants Butts, McCormick and Wilson contracted for the purchase of the whole property of the plaintiff, real and personal, including the railroad and its equipment, and at once took possession and began cutting, manufacturing into lumber the timber, and marketing the same.     It was evidently the intention of the plaintiff in making the sale, and presumably that of the purchasers, from the provisions made in the contract for payments of $5,000 every month, that the timber should be paid for about as fast as it was removed.   The timber constituted the chief value of the larger part of the land purchased and at the price the defendants claim they were to have an abatement for the failure of title to the standing timber and which claim is supported by the written contract as it is written, and in case it shall hereafter be found there was no mutual mistake - as charged by plaintiff in fixing the amount to be abated therefor, at $19 per acre of standing timber, such standing timber being 16059 acres, at the said price, alone, would represent over $305,000, or more than three-fourths of the sum to be paid by the defendants for the whole purchase.   The defendants prosecuted vigorously the cutting and removal of the timber for some eighteen months without paying a dollar on the monthly payments of $5,000 each, agreed by them to be paid, insisting that they could not be required to pay any of the deferred payments of the purchase-money until a perfect deed of general warranty for all the property was made to them by the plaintiff and free from encumbrance, and cite many authorities to support their contention.   And their position in cases where the contract has been completed by giving the notes for the deferred payments so as to entitle the vendor to his liens that he may proceed if necessary to enforce payment, is the correct position and supported by their cited authorities, but it will not hold good in a case where the vendee has taken possession, and, while

refusing to carry out his contract by giving his notes and paying no part of the deferred payments of the purchase-money long past due, is taking off and appropriating wholly to his own use that element of the real estate which constitutes its chief value, as to a large part of the real estate in controversy here, the · standing timber seems to constitute almost the sole value.    In *Gates* v. *McLean*, 70 Cal. 42, it is held that where the contract provides for the vendee taking possession, his remedy, in case the title of the vendor fails or he is unable to make a conveyance as stipulated, is to rescind or offer to rescind and restore the possession; in which event he may recover the purchase-money advanced with interest together with the value of his improvements deducting therefrom such sum as the use of the premises may reasonably be worth, but if he chooses not to rescind but to retain possession under the contract he can do so only on condition that he pay the purchase-money and interest according to the contract.    In the latter case it is considered that he is willing to receive such title as the vendor is able to give and is content with the personal responsibility of the vendor upon his covenants.    And in *Rhorer* v. *Bila*, 83 Cal. 51, Syl. pt. 1: · ''A purchaser cannot remain in possession of lands under a contract, and at the same time refuse to pay the stipulated purchase price.    He must surrender possession or show an eviction before he can defend a suit for the purchase-money, or show a failure of consideration, or counterclaim to the purchase-money, or damages for delay in performance of the contract of the vendor.    So long as he retains possession he waives all objections, whether of defect of title or delay in completing it, and is bound to accept title according to the terms of the contract, if offered while he still retains possession.'' In *Lynch* v. *Baxter*, 4 Texas 431, (51 Am. Dec. 735): ''A vendee cannot resist payment of purchase-money on ground of defect of title in the vendor, while he retains the title bond and continues· in· the possession of the land.''   In *Worley* v. *Nethercott*, 91· Cal. 512, (25 Am. St. Rep. 209), it is held: ''If, after a contract is made for the sale of real property, it is ascertained that the title of the vendor is not perfect, the vendee must either rescind the contract and restore possession, or accept the title as it is and pay the

purchase price.    He cannot, while declining to pay such price on account of the defect in the title, hold possession of the property until the title should be perfected." This principle is well settled.    *Stave Co.* v. *Smith,*  116 Ala.  416, (67 Am. St. Rep. 140); *Gates* v. *McLean,* 70 Cal. 42; *Rhorer* v. *Bila,* 83 Cal. 51; 3  Pom. Eq. Juris., section 1260;  *Giles* v. *Williams,* 3 Ala. 316, (37 Am. Dec. 692;)  *Lynch* v. *Baxter,* 4 Texas 431, (51 Am. Dec. 735;)  *Vail* v. *Nelson,* 4 Rand. 478; *Johnston* v. *Jarrett,* 14 W. Va. 230; *Rader* v. *Neal,* 13 W. Va. 373; *Goddin* v. *Vaughn,* 14 Grat. 125.

Counsel for appellants in their brief say:    "The title of Henry Spies to the real estate sought to be conveyed is so defective and covered with liens and encumbrances, that a court of equity will not compel the defendants to accept and pay for it."    While the plaintiff in his bill says that he is advised that he is entitled to have specific performance of the contract of January 28, 1904, and that if he be mistaken in that then, that the said contract should be rescinded and the parties placed in *statu quo,* that the defendants might not refuse to carry out the contract and yet reap all the benefits thereof and refuse to pay for them.    If the deed tendered by plaintiff to the defendants for the property sold them by him is liable to all the criticisms and objections raised against it by the defendants and this could be made to appear to the satisfaction of a court of equity, they would have little trouble in this cause to have a rescission of the contract, but they seem neither to desire a rescission nor to perform their part of the contract by making the notes, or paying anything on account of the purchase-money.    As to the liens upon the lands constituting a part of the objections of defendants to the deed tendered them by plaintiff, and which plaintiff testifies do not amount in all to more than from $15,000 to $20,000, the defendants have a right to compel the application of the purchase-money due from them to the payment of such liens and have credit therefor upon the purchase money.    *Douglass* v. *Rutherford,* 25 W. Va. 708; *Curry* v. *Hale,* 15 W. Va. 867.

It appears from the affidavits filed that all the timber has already been removed by appellants from some of the tracts and a large portion from others, and that the timber constitutes the chief value of the land and that when the

timber is removed from the land a large part of it would be almost worthless. Affiants stating that the property was constantly being depreciated in value. Many affiants state that in their opinion the whole property would not sell for $300,000. There is some evidence tending to prove the insolvency of the appellants, defendants in their answer make a general denial of the allegation of insolvency but it is not made to appear affirmatively that they have assets to any considerable amount other than that purchased from plaintiff, while indebtedness is shown, besides the $300,-000 of purchase money to plaintiff, of at least $19,500; that on contracts for services for which cash was to be paid the parties who were entitled to cash were put off for a long time with the notes of appellants who said they could not pay cash.

There is much evidence in the affidavits filed in the case of the mismanagement of the business and want of experience therein, not only general statements of the fact, but giving specific acts of mismanagement resulting in waste. Defendants rely principally to overcome the effect of these affidavits upon their denial in the answer to the allegations of plaintiff's bill touching the bad management of the business and the incompetency of the managers. The answer is not taken as proof even when sworn to, the general replication to the answer puts the defendants on proof of the allegations thereof.—*Knight v. Nease*, 53 W. Va. 50; Code, chapter 125, section 38. Defendants claim "that they have placed on the said land and railroad in the shape of permanent improvements about Seventy Thousand Dollars." They extended the railroad some 3 or 3½ miles at a cost, as they claim, of about $31,000, as a part of such "permanent improvements." Alex. W. Ewing, a civil engineer, who assisted as such engineer in the construction of the 13 or 14 miles of said railroad constructed by plaintiff at a cost (as claimed) of $74,000, states that the same was all or principally over mountains and hills, through mountain gorges, along side hills, which were, many of them, very steep, and altogether a very rough route over which to construct a railroad; that on the other hand the part of the road constructed by Butts, McCormick and Wilson was through bottom lands and over an easy and cheap route of construction, and states that he

"believes the cost of constructing the road bed made by said Spies is as per mile four times as great as that per mile as that constructed by Butts, McCormick and Wilson."

If this statement be true the outlay of defendants for the construction of the extension of the railroad of 3 or 3½ miles was at an unnecessarily extravagant cost. Appellants' counsel further say, "Abatements are now due from the plaintiff to the defendants to a larger amount than unpaid purchase-money;" the words "now due" in said statement meaning as of the date of the decree. The contract contains the following provision: "It is understood and agreed, however, that if the said party of the first part shall be unable by the said first day of July, 1904, or at the time of the delivery of the deed hereinbefore mentioned, to make good title to any of the tracts of land, coal and standing timber, intending to be conveyed by this agreement, the same may be conveyed by him to the parties of the second part at any time before final settlement shall be made of the purchase price aforesaid, upon the perfecting of his title thereto, and no abatement shall be made of said purchase price by reason of any such tracts so conveyed before such final settlements." Abatements under this provision of the contract are matter for future adjudication. Appellants cite *Wilson* v. *Maddox*, 46 W. Va. 641, where it is held in Syllabus, pt. 3: "When the equities of the bill are fully and fairly denied by answer, unless the plaintiff overcome such denial by other testimony, the question should no longer be regarded as one addressed to the discretion of the court, but it is error to appoint a receiver when the charges of the bill are so denied." And also cite *Ruffner* v. *Mairs*, 33 W. Va. 655; High on Receivers, Par. 24; and 1 Bart. Chy. Prac., section 146, as conclusive against the appointment of the receiver in this case, defendants having answered denying the allegations of the bill. Said section 146, Bart. Chy. Prac. says: "The evidence necessary to overcome the effect of an answer may be introduced by affidavits, which may be filed both before and after the answer comes in; and it is enough that the plaintiff by his bill and affidavits makes out a *prima facie* case, for the court in passing upon the application in no manner anticipates the ultimate judgment upon the rights of the parties on the

merits of the case; indeed, so little does the court consider the merits of the case, that on such an application (for a receiver) it will not even regard an objection that the bill is multifarious, or that it is faulty for misjoinder of parties." —Citing High on Receivers, sections 84, 85, 86, 88, 89 and 738. And it is there further said: "The evidence introduced when the application is before decree must be in support of the allegations of the bill, and the answer of the defendant is to be regarded merely as his affidavit."

As a further reason for the appointment of a receiver the plaintiff makes the following allegation: "That the defendants, James McCormick, Ida M. Butts and Harry T. Wilson, have refused to pay taxes for the year 1904, on the real estate conveyed to them by the plaintiff, and some of the same has been returned delinquent, and unless redeemed, the same will be sold by the State for the non-payment thereof." In order to prevent the returning of some of the said land delinquent, the plaintiff has been compelled to pay a part of the taxes thereon, and the defendants, James McCormick, Ida M. Butts and Harry T. Wilson, refuse to refund the amount so paid by him." This allegation seems to have been ignored by the defendants both in their answer and in their briefs of counsel, except a general denial in the answer where they "deny each and all the allegations of said bill not herein specifically admitted to be true, and call for full proof thereof." In *Darusmont* v. *Patton*, 4 Lea (Tenn.) 597: "It is a good ground for the appointment of a receiver of land in a suit pending in this court, where the decree below declares the applicant to have a lien on the land for the payment of debt, that there are taxes due and unpaid which are about to be enforced by a sale of the land, unless the party in possession will pay the taxes in a reasonable time." See note to *Cameron* v. *Improvement Company*, (20 Wash. 169) 72 Am. St. Rep. at page 95: "As between the parties the one in possession—whether vendor or vendee—is liable (for taxes), unless it is otherwise stipulated, and, if the one not in possession is compelled to pay them, he has a remedy over against the other. A vendor who has thus been forced to pay taxes may withhold conveyance until reimbursed."—28 A. E. E. L. (1st ed.) 125; *Hill* v. *Denckla*, 28 Ark.

506.   In *Creigh* v *Boggs*, 19 W. Va. 240, (Syl. pt. 5,) it is held:  "Where a written contract for land has been made, and the vendee dies, and the vendor of the land is compelled to pay taxes incurred after the death of the vendee to prevent the sheriff selling it for delinquent taxes, the heirs and not the administrator of the vendee are bound to refund to the vendor the taxes so paid; and he is not bound to deliver them a deed for the land, till they have done so, though the administrator may have paid him the whole of the purchase-money."   In *Farber* v. *Purdy*, 69 Mo. 601, it is held:  "A vendee of real estate in possession under a contract of sale is liable, as between himself and the vendor, for all taxes assessed after the commencement of his possession, and the fact that by the contract the vendor is bound to make him a warranty deed upon payment of the purchase money, does not change this rule."

When the plaintiff sold these lands to the defendants, in his contract of sale it was provided;  "As a further security for the payment of said sum of $300,000.00 a vendor's lien shall be retained by the party of the first part upon all the real estate above described, and a deed of trust shall be executed by the said Pickens and Hackers Valley Railroad Company upon all and singular its real estate, rights of way, rolling stock, equipment, rights and franchises to secure the payment of the same, the execution of which said deed of trust shall be contemporaneous with the transfer to the parties of the second part of the capital stock of said corporation."   And in a suit to enforce his rights against the real estate under his contract, if it appear that the property is being wasted or depreciating in value the court should appoint a receiver.   The vendor had a right to look to the land and its timber for security and if the property is in danger of loss or misappropriation he is entitled to the aid of a court of equity to protect his interest by taking charge and preserving the property.   In *Core* v. *Bell*, 20 W. Va. 169, (Syl. pt. 1,) it is held:   "An injunction to stay waste ought to be granted a vendor against a vendee, to whom he has sold a tract of land in fee simple retaining the title as a security for the purchase-money, who brings his suit to subject the land to the payment of the purchase-money, and the bill charges the defendant with cutting timber on the land

in a manner calculated to render it an incompetent security for the payment of the purchase-money. In such a bill it is not necessary to allege the insolvency of the defendant." At page 174, in the last mentioned case it is said in the opinion: "In a bill for such a purpose it is not necessary to allege the insolvency of the defendant. The vendor has retained the title as security for the purchase money and he has a right to look to the land for payment thereof, and is not under any circumstances during the life of the vendor compelled to look elsewhere for payment." In *Ogden* v. *Chalfant*, 32 W.Va. 559, (Syl. pt. 2,) it is held: "A receiver may be appointed in such case whenever it is shown in any proper manner that the debtor is insolvent, or that the lands are likely to prove insufficient to satisfy the undisputed or ascertained liens thereon."

It is contended by counsel for appellants that plaintiff had no lien on the timber after it was severed, that while standing it was realty and the moment it was severed it became personalty and the absolute property of the vendees. Plaintiff had no occasion up to this time for his vendor's lien upon the land as he had sold it by an executory contract and had withheld the legal title to the whole property as security for the purchase-money until by the completion of the contract by the making of the notes of $5,000 each to be paid monthly by the defendants and the execution by plaintiff of a deed for the property, his vendor's lien would be effective. It is true he had no vendor's lien upon the timber either before or after it was severed, for such lien was not yet acquired, but he held the legal title as his security. 2 Jones on Liens, section 1107, says:

"A LIEN BY CONTRACT IS NOT A VENDOR'S LIEN. The interest of a vendor who has given an ordinary contract or bond for the sale of land, but retains the title to the land in himself, is often spoken of in the cases as a vendor's lien; but it is conceived that this is a misuse of terms, which should be avoided as leading to confusion. There is fundamental distinction between a vendor's security in such case and the lien implied by law, and properly known as the vendor's lien. When the legal title remains in the vendor, the vendee has merely an equity of redemption in the land, and no act of his can possibly affect the vendor's

title; while, in case of a mere lien in the vendor, the fee is in the purchaser, who may at any time discharge the lien by conveying the land to a *bona fide* purchaser for value. In the one case the vendor has a lien without any title, and in the other he has the title without any occasion for a lien. His title, by the terms of the contract, is his security; and he cannot in any way be divested of his title, except the vendee fulfills his contract, and by that means becomes entitled to a conveyance." In treating of liens arising from express contracts, section 1235, in his 3rd volume, Mr. Pomeroy says: "The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice. Under like circumstances, a merely verbal agreement may create a similar lien upon personal property."—And cases there cited.

Plaintiff and defendants had entered into this contract of January 28, 1904, intending that the whole property should remain as security for the purchase-money of the realty and it appears from the contract itself that the cash payment was to pay for the personal property purchased and for such timber as might be cut and removed within the first few months and until the contract might be completed by the execution of the deed on the part of the plaintiff and the making of the 59 $5,000 notes for the residue of the purchase-money. The defendants elected to take possession under the contract and continue to cut and remove the timber while refusing to accept the deed tendered them. While they had entered lawfully into possession they were cutting and removing the timber in violation of the contract, from the time they refused to make the notes required by the contract. A part of the timber cut and manufactured has not been removed from the premises to which the plaintiff still has the title, and it is

shown that the defendants are removing the timber and refusing to make the notes as required by the contract, or to apply any of the proceeds of their product from the land to the payment of the purchase-money due from them to the plaintiff. "A vendee in possession must do nothing to diminish the security of his vendor, either by committing waste or removing annexations of a permanent character."—28 A. & E. E. L. 122 (1st ed.). If defendants contention is correct, they could, if they chose, sever all the timber on the land and convert it into personal property of which they would be the absolute owners and so deprive the plaintiff of his lien or right to look to the timber so severed for his purchase-money, and they could transfer their interest, or good title, in or to the same to an innocent purchaser without notice of their fraud, thus depriving the plaintiff of any remedy as against the timber. In section 1260, 3 Pom. Eq. Juris., it is said: "There is a plain distinction between the lien of the grantor after a conveyance, and the interest of the vendor before conveyance. The former is not a legal estate, but a mere equitable charge on the land; it is not even, in strictness, an equitable lien until declared and established by judicial decree. In the latter, although possession may have been delivered to the vendee, and although under the doctrine of conversion the vendee may have acquired an equitable estate, yet the vendor retains the *legal title*, and the vendee cannot prejudice that legal title, or do anything by which it shall be divested, except by performing the very obligation on his part which the retention of such title was intended to secure—namely, by paying the price according to the terms of the contract." The defendants have remained in possession of the land after their contract required them to give the 59 notes of $5,000 each for the deferred payments of purchase-money, cutting and removing the timber therefrom, refusing to pay anything on the purchase-money and refusing to make said notes as required by the contract, and equity will give the vendor a right to hold the manufactured product remaining on the premises liable to the purchase-money past due to him.

Appellants say the court erred in fixing the penalty of bond to be given to them on their motion in order to set aside so much of the decree as appointed a receiver and re-

fused to dissolve the injunction, claiming that a penalty of $150,000, required by the court, was excessive. There is nothing offered in the petition or briefs of appellants to sustain this assignment of error except the assertion that it is exorbitant and excessive. We see nothing in the record to satisfy this Court of their contention, or that would warrant the appellate court in holding that the court erred in this regard.

For the reasons herein given the Court is of opinion there is no error in the decree of the circuit court and the same is affirmed and the cause remanded to the circuit court of Upshur county for further proceedings to be had therein according to the rules governing courts of equity.

*Affirmed.*